AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

**FILED**

AUG 1 0 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

United States of America
    v.

DANIEL RUSH

_____
*Defendant(s)*

)
)
)
)
)
)

Case No.

**4-15-71008**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  August 2010 through August 2014  in the county of  Alameda  in the  Northern  District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 29 U.S.C. § 186 | Labor union conflict of interest payments |
| 18 U.S.C. § 1341, 1343 and 1346 | Honest services fraud |

Approved as to form: _____

AUSA John H. Hemann

This criminal complaint is based on these facts:

See attached AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Roahn Wynar, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  Aug 10, 2015

_____
*Judge's signature*

City and state:  Oakland California

HON. DONNA M. RYU
*Printed name and title*



## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Roahn Wynar, a Special Agent with the Federal Bureau of Investigation in San Francisco, California, being duly sworn, hereby depose and state the following:

### PURPOSE OF AFFIDAVIT AND AGENT BACKGROUND

I am an "investigative or law enforcement officer of the United States," within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code.

### A. Summary and Purpose of Affidavit

1. This affidavit is submitted in support of a request for an arrest warrant I am seeking for DANIEL JAMES RUSH. As set forth herein, probable cause exists to believe that RUSH is engaged in criminal violations of the Taft-Hartley Act, 29 U.S.C. § 186 (labor union conflict of interest payments) and 18 U.S.C. §§ 1341, 1343 and 1346 (honest services fraud).

2. RUSH is an official with the United Food and Commercial Workers union. His position involves expanding the union's presence in the marijuana industry and includes efforts to unionize marijuana dispensary workers.

3. From 2010 through August 2014, RUSH, while a UFCW official, received payments of money or other things of value from several individuals who were agents of employers who would employ individuals who would be admitted to membership in the UFCW, or as individuals with a present intention to employ such persons. There is probable cause to believe that the receipt of these payments violated the Taft-Hartley Act's prohibition on the receipt of money by union officials and RUSH's duty of honest services to the UFCW.

1

4. Separately, RUSH borrowed $600,000 in cash from Martin Kaufman. Kaufman is in the business of operating marijuana dispensaries and Kaufman obtained the money he loaned RUSH from the sale of marijuana. The loan was a personal loan to RUSH.

5. RUSH was and is unable to repay the $600,000 debt. In exchange for forgiveness of this personal debt, RUSH and his associate MARC TERBEEK, an attorney, proposed and took steps to provide various labor benefits to Kaufman, including union support for opening dispensaries and reducing or eliminating pressure to unionize dispensary workers. The offered benefits violate the Taft-Hartley Act and conflict with RUSH's fiduciary duties to the UFCW.

6. I am familiar with the information contained in this Affidavit based upon the investigation I have conducted, my training and experience, and information provided to me by other law enforcement officers who have participated in this investigation and in investigations involving bribery and fraud.

7. All of the recorded conversations referred to in this Affidavit were consensually recorded by one of the participants in the conversation. I personally have listened to all of the recordings referred to herein.

8. Because this Affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of violations of the federal laws described below were committed by RUSH.

### B. Affiant Background

9. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since February 2003. I have been assigned to the San Francisco Field Division's Oakland Resident Agency for the duration of my time with the FBI. Currently, I am assigned to

2

the Public Corruption/Civil Rights Squad, which investigates abuse of public office in violation of criminal law, to include fraud, bribery, extortion, conflicts of interest, and embezzlement. During my FBI employment, I have conducted investigations associated with public corruption, fraud, environmental crimes, illegal narcotics, mail and wire fraud, securities fraud, antitrust violations, terrorism, espionage, and other matters. As a federal agent, I am authorized to investigate violations of the laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

## FACTS SUPPORTING PROBABLE CAUSE

### A. Subject

10. DAN RUSH is a union executive. The International United Food and Commercial Workers (UFCW) is a labor organization that represents primarily food and retail workers. In 2011, the UFCW established a medical cannabis and hemp division (the "Cannabis Division") in order to organize employees in the emerging medical marijuana industry. The Cannabis Division also actively lobbies on behalf of marijuana legalization efforts. In 2011, the UFCW appointed RUSH, a 54 year-old resident of Oakland, California, as the Executive Director of the Cannabis Division. RUSH previously worked for UFCW Local 5, based in San Jose, California, which represents employees throughout Northern California. RUSH resides at 468 West MacArthur Boulevard, Oakland, California, and keeps his business office at that location.

11. RUSH is also the treasurer of the Instituto Laboral de la Raza ("Instituto"). The Instituto is a non-profit organization which provides advocacy for the working poor. RUSH is the Instituto's treasurer. RUSH's affiliation with the Instituto is predicated on RUSH affiliation with the UFCW. In fact, all eleven members of the Instituto's executive board of directors and board members are all employed by labor unions.

3

12.

### B. Primary Witnesses

13. MARC TERBEEK was a real estate and workers' compensation attorney whose office was located at 2648 International Boulevard, Suite 115, Oakland, California. TERBEEK is 53 years old. TERBEEK's legal clients include prospective medical marijuana dispensary operators who sought to employ people eligible for UFCW membership and workers compensation claimants referred to TERBEEK by the Instituto. The FBI and IRS-CID executed a search warrant on TERBEEK's office on January 7, 2015 and since then TERBEEK has been cooperating with the investigation.

14. TERBEEK has been informed by the United States Attorney's Office that he is a target of this investigation and is likely to be prosecuted. He is represented by counsel, Edward Swanson and August Guglemann. TERBEEK is cooperating with the FBI investigation for the purpose of mitigating his culpability and reducing his ultimate sentence. TERBEEK is an attorney. He has informed me that he has considered the issue of attorney client privilege and consulted with Mr. Swanson and Mr. Guglemann regarding whether the information he has provided to the FBI is protected by the attorney-client privilege, and has not provided the FBI with privileged information.

15. From 2002 to 2005, Carl Andersen operated a medical marijuana dispensary in Oakland, California. Between 2010 to 2012, Andersen sought to obtain one of the four new dispensary licenses scheduled to be issued by the City of Oakland. Andersen worked closely with RUSH and TERBEEK on his application for a license using the corporate entities, AMSG Inc. and AMCD Inc. In both 2010 and 2011, Andersen participated in UFCW publicity events as a pro-union employer who would sign a collective bargaining agreement with UFCW, Local 5.

4

Andersen participated in a public event where he signed a collective bargaining agreement with UFCW Local 5 to cover the employees of his planned dispensary. Since October 2012, Andersen has cooperated with the FBI on a voluntary basis. Information that Andersen has provided to the FBI has been independently corroborated and I consider Andersen to be a credible witness. Andersen has been paid $6,128 since his contact with the FBI, of which $128 represents reimbursed expenses.[1]

16. Since 2011, Martin Kaufman and his wife have partnered with Derek Peterson to operate Blum Oakland. Kaufman is also employed by MediFarm, a separate subsidiary of Terra Tech. Before his relationship with Peterson, Kaufman operated a construction enterprise that built medical marijuana cultivation facilities. Since October 2013, Kaufman has participated in this investigation on a voluntary basis. Information that Kaufman has provided to the FBI has been independently corroborated and I consider Kaufman to be a credible witness. I have informed Kaufman that he will not be prosecuted for his conduct regarding the origin of the cash and the subsequent scheme to structure the cash into the banking system described in this Affidavit. This is not a formal non-prosecution agreement between the United States and Kaufman, but AUSA Hemann has informed me that consistent with the U.S. Attorney's Office policy on medical marijuana, it is not the intention of the U.S. Attorney's Office to prosecute Kaufman for the medical marijuana-related conduct described in the Affidavit.

17. Derek Peterson was Kaufman's partner and a business acquaintance of both RUSH and TERBEEK.

---

[1] Andersen has a criminal record. In 1981 Andersen was convicted of writing a bad check. In 1984 Andersen was charged with violating his parole associated with the 1981 charge. Other charges include marijuana/paraphernalia possession in 2006 with no conviction. He was charged with solicitation of prostitution in 1977, but the charge appears to have been dropped. Anderson is a regular marijuana user, though I have not observed any impairment of his memory or cognitive abilities.

18. I have asked witnesses to record both telephonic and in-person communications with RUSH and TERBEEK. In this Affidavit I reference some of these recorded conversations and describe them as "monitored" communications. I have personally reviewed all of the monitored communications.

### C. There Is Probable Cause To Believe That RUSH Accepted Money In Exchange For His Actions And Influence As A UFCW Union Official.

19. From 2010 through August 2014, RUSH, while a UFCW official, received payments of money or other things of value from Andersen, Peterson, Kaufman, and TERBEEK who were agents of employers who would employ individuals who would be admitted to membership in the UFCW, or as individuals with a present intention to employ such persons. There is probable cause to believe that these payments were unlawful in at least two respects:

- **Conflict of Interest Payments.** Section 302(a)(1) of the Taft-Hartley Act prohibits employers from transferring money or other things of value to the "representatives" of its employees. Section 302(a)(2) similarly prohibits employers from transferring money or other things of value to "any labor organization, or any officer or employee thereof which represents, seeks to represent, or would admit to membership, any employees of such employer . . . ." See 29 U.S.C. §§ 186(a)(1) and (a)(2). Section 302(b)(1) specifically covers RUSH in the circumstances of this matter. It provides: " It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section." 29 U.S.C. § 186(b)(1).

- **Honest Service Fraud.** The federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343, and 1346) make it a crime to use the mail or interstate wire communications for the purpose of executing a scheme or artifice to defraud to "deprive

6

another of the intangible right of honest services." Under section 1346, undisclosed self-dealing schemes which involve a breach of fiduciary duty, coupled with either bribery or kickbacks, may be prosecuted under section 1346. A union official may defraud union members of the intangible right of the official's honest services when he receives secret bribes or kickbacks when conducting union business in violation of a statutory duty; a duty under a contract such as a collective bargaining agreement; or a duty found in a union's constitution. See United States v. Rodrigues, 678 F.3d 693, 700 (9th Cir. 2012). Both Article 25 of the UFCW Constitution and section 501(a) of Labor Management Reporting and Disclosure Act (29 U.S.C. § 501(a)) specify that RUSH owed a duty of fidelity to the UFCW and its membership.

20. Receipt by RUSH of payments from employers who did or could employ individuals the UFCW would admit to membership would violate section 302(b)(1) of the Taft-Hartley Act 29 U.S.C. § 186(b)(1). The same or similar payments, if they constitute a bribe or kickback to RUSH for official actions, would separately constitute honest service fraud under section 1341, 1343, and 1346.

### Payments by Anderson

21. In 2010, Anderson sought a medical dispensary license to reopen his medical marijuana clinic, under the corporate entity AMCD, Inc. Andersen perceived the support of the UFCW and Local 5 was valuable in this new process for several reasons. First, the City of Oakland has promulgated "criteria of merit" by which applicants for dispensary licenses would be judged. Under those criteria, the endorsement of UFCW Local 5 may be scored in the applicant's favor. Second, the endorsement of an applicant by the UFCW and/or Local 5 would be an important signal to city and state officials seeking to gain or maintain labor support. Lastly, RUSH had

7

significant knowledge concerning the legalization efforts in many jurisdictions and was acquainted with many of the public officials and lobbyists critical to licensing efforts.

22. In March 2010, Andersen reported that RUSH introduced him to Kaufman and Kaufman delivered $50,000 in cash in a paper bag to Andersen as an investment in AMCD, Inc. Andersen further reported that RUSH returned the next day and took $35,000 of Kaufman's cash. During that meeting, RUSH told Andersen that RUSH would be taking half of all the money RUSH raised for AMCD, Inc. A few weeks later, Andersen reported that Kaufman delivered another $35,000 in cash to him in a paper bag. On the same day, after Kaufman departed, Andersen reported that RUSH took $10,000 of the cash for himself.

23. Andersen also informed me RUSH demanded a secret interest in AMCD using Kaufman as a proxy. According to Andersen, a vice president for AMCD produced stock certificates for each shareholder including Kaufman and RUSH. RUSH objected to his name being used on the stock certificate and asked Andersen to reprint RUSH certificate's in Kaufman's name to disguise RUSH's ownership. AMCD, Inc. incorporation documents created in 2010 show that RUSH held at least $51,000 worth of shares of ownership. The new stock certificates were never issued. An AMCD, Inc. document showing RUSH's ownership position in AMCD, Inc. is in the possession of the FBI.

24. Throughout this time period, RUSH was a UFCW official.

### *Payments by Kaufman*

25. Kaufman reported to me that, in January 2010, he delivered $500,000 in cash to RUSH at the office of TERBEEK. Kaufman said that the cash represented the proceeds of his participation in medical marijuana operations. RUSH had told Kaufman that RUSH needed the funds to rehabilitate a house at 472 W. MacArthur Boulevard in Oakland owned by RUSH's

family trust to convert it into a medical marijuana dispensary. The loan's term was to last five years, whereupon RUSH would settle the outstanding principal.

26. TERBEEK prepared a phony employment agreement, executed by RUSH and Kaufman, whereby RUSH would pay Kaufman a "consultancy fee" of $3,000 a month until January 2015 as a "consultant" for RUSH's family trust. In reality these payments were interest only payments and the principal of the loan would be returned to KAUFMAN in approximately January of 2015. Since the time of the loan KAUFMAN never provided any consulting services, but TERBEEK and the Rush family trust provided KAUFMAN with IRS Forms 1099 each year since 2010 falsely indicating KAUFMAN was being retained by RUSH's family trust. Both RUSH and TERBEEK have conceded the above facts during numerous monitored conversations. TERBEEK admitted to these facts to the FBI after TERBEEK began cooperating with the investigation.

27. In several monitored conversations, TERBEEK explained to RUSH how he put the $500,000 cash Kaufman lent to RUSH into TERBEEK's attorney trust account by executing a series of structured cash deposits during January and February of 2010. TERBEEK also explained how this structured money was used to retire a private hard-money loan made to RUSH, which used RUSH's home as collateral. TERBEEK has also told the FBI that RUSH was aware of this structuring.

28. I have obtained bank records from TERBEEK's client account at Well Fargo Bank (acct # 6298418473). Those records show that, in January and February of 2010, TERBEEK executed a series of over 40 cash deposits, each less than $10,000. Those records also show that, on February 26, 2010, after the last cash deposit, TERBEEK ordered a $420,000 cashier's check made payable to RUSH's private lender. This payment was coincident with escrow documents

9

memorializing the payment of the loan and removing the Deed of Trust on 472 W. MacArthur Blvd, Oakland, California, which had collateralized the that loan.

29. Kaufman reported to me that he provided an additional $100,000 in cash to RUSH a few months after Kaufman's $500,000 loan to RUSH in January 2010, bringing RUSH's total indebtedness to Kaufman to $600,000, due in January 2015. The additional $100,000 in cash was also derived from the proceeds of medical marijuana cultivation operations. Escrow records obtained by the FBI indicate that RUSH used those funds to purchase the house adjacent to 472 W. MacArthur in Oakland. During numerous monitored conversations, both RUSH and TERBEEK acknowledged that RUSH is indebted to Kaufman for $600,000 with the bulk of the total principal due January 2015. TERBEEK corroborated these facts during his interviews with the FBI.

30. Throughout this time, Kaufman was an employer who could employee members of the UFCW and RUSH was a UFCW official.

### *Payments by Terbeek*

31. TERBEEK reported to me that TERBEEK has been paying kickbacks to RUSH since approximately 2004. In 2006 RUSH encouraged TERBEEK to acquire a law practice which handled workers compensation casework and to use this practice to litigate workers compensation claims generated by the Instituto. In exchange for this, TERBEEK provided RUSH a credit card associated with TERBEEK's law firm and TERBEEK paid off this card routinely.

32. RUSH sent TERBEEK a text message on February 4, 2015. By this time, TERBEEK was cooperating with the FBI and I examined the message. In it, RUSH wrote (errors as in original), "Please make sure the card is HEALTHY BY FRIDAY fir the big dinner. I will need to use

10

encumbered. Please." TERBEEK explained to me that RUSH was reminding TERBEEK to

payoff the credit card so that RUSH could freely spend on it during the Instituto's annual dinner

honoring labor. Based on the context of the overall text and also based on TERBEEK's

understanding of the message, I believe that "encumbered" was intended by RUSH to be

"unencumbered"

33. On February 20, 2015 TERBEEK monitored a meeting with RUSH. During this

conversation RUSH said, "Just keep the card going for me."

34. After TERBEEK began cooperating with the FBI, TERBEEK agreed with RUSH to

share the fees derived from TERBEEK's clients who were seeking permits to operate medical

marijuana dispensaries in California, Nevada, and other places.

35. On May 8, 2015 TERBEEK monitored a telephone call with RUSH. By this time RUSH

and TERBEEK had agreed to reignite their previous partnership associated with the Instituto but

this time focusing on TERBEEK's medical marijuana related clients. They had the following

conversation which corroborated TERBEEK's account of the credit card kickbacks and also

provided an indication of RUSH's dependence on the kickbacks:

> *DAN RUSH: Okay, alright, the other thing is, is I am going to try to work you in with*
> *[PETERSON] on his pursuits in New York.*
> *TERBEEK: Alright.*
> *DAN RUSH: Okay?*
> *TERBEEK: Alright, cool!*
> *DAN RUSH: That's why I have been calling you the last couple days, I just want you to*
> *know- you know I left that meeting and trying to get things back together.*
> *TERBEEK: I appreciate that- I appreciate that you know you're trying to do business and*
> *get business for us and so we can, you know, get back- I know you- your wanting*
> *resources and getting back to— these referrals can get you these resources.*
> *DAN RUSH: All I, all I want, all I, all I want right now is- I need that card back.*

11

TERBEEK explained to me that "resources" was coded language for "money." This conversation was referring to the new partnership being formed by TERBEEK and RUSH and that RUSH wanted the new partnership to continue paying RUSH through the credit card.

36. TERBEEK provided the FBI with bank statements associated with the credit card TERBEEK provided to RUSH for the period of October 2010 to February 2015. I reviewed these statements and discovered that RUSH charged approximately $110,000 on TERBEEK's card during this period, an average of approximately $2000 per month. I also examined the individual expenses associated with this card and discovered them to be generally of a personal nature to include charges made at department stores, restaurants, grocery stores, automobile service centers, gas stations, a jewelry store, Pacific Gas and Electric Company, Southwest Airlines and other air carriers, airports, smoking supply stores, parking facilities, newspapers, pharmacies, diabetic supply stores, Indian casinos, and other places. None of these personal expenses appeared to be extravagant or unusual with the exception of several large payments to Verizon Wireless. Specifically those expenses occurred on October 2013 - $3,555,  January 2013 - $1,000, December 2012 - $1,000, August 2012-$1,000, May 2012 - $2,000, August 2011- $2,811.03. According to TERBEEK the bills associated with Verizon Wireless were charged because RUSH was paying for the telephone service of RUSH's Hell's Angels Motorcycle Club (HAMC) associates.

37. Since the creation of the new partnership, TERBEEK has paid $5,000 to RUSH as RUSH's share of TERBEEK's legal fees associated with TERBEEK's medical marijuana clients. This was done under FBI supervision. These payment were acknowledged by RUSH. The first payment was made by check and TERBEEK wrote the name of the medical marijuana client on the memo line. RUSH admonished TERBEEK not to include the names of clients on subsequent

check. Specifically RUSH said, "Okay, hey I did not really look at [the check] and then you know I got to look at it and then it came back in the mail and I was like "oh fuck." ... You know you don't have to wrap the rope around my neck buddy. I'm your brother." I believe this statement is evidence that RUSH was deliberately trying to hide the fact that RUSH is sharing fees with TERBEEK.

38. Throughout this time, TERBEEK was an agent of employers who could employ UFCW members, and RUSH was an official of both the UFCW and the Instituto.

### D. There Is Probable Cause To Believe That RUSH And TERBEEK Provided And Offered UFCW Labor Benefits To Kaufman In Exchange For Loan Forgiveness.

39. In early 2014, TERBEEK revealed to Peterson that RUSH would be unable to pay Kaufman the $600,000 RUSH owed Kaufman. This revelation began a series of proposals and actions by RUSH and TERBEEK to substitute labor and tax benefits for the debt.

40. TerraTech formed MediFarm as a wholly-owned subsidiary in order to enter the Nevada marijuana cultivation and retail markets. Peterson serves as MediFarm's Manager and Chief Financial Officer, and Kaufman serves as a board member and Director of Quality Assurance.

41. Beginning in 2013, RUSH and TERBEEK met with Peterson concerning Peterson's plans for MediFarm to enter new markets once legalization occurs, particularly in Las Vegas, Nevada which was assumed to be a lucrative market but difficult to navigate politically. These meetings were consensually recorded and I have listened to the recordings. At these meetings, Peterson stressed that MediFarm sought the UFCW's support for its applications in Nevada and elsewhere. RUSH's outstanding debt of $600,000 to Kaufman, by then an employee of Peterson, due in January 2015, was also repeatedly discussed as it loomed as a potential obstacle to MediFarm's plans to gain the endorsement of the UFCW through RUSH.

13

42. During a monitored conversation on January 28, 2014, TERBEEK informed Peterson that RUSH was unlikely to pay back the $600,000 RUSH owed Kaufman by the January 2015 deadline. TERBEEK raised the idea that Kaufman could forgive the loan in exchange for MediFarm receiving RUSH's advice and/or the support of the UFCW in its Nevada applications. TERBEEK opined that a "haircut" of the outstanding loan amount was appropriate because that was all that Kaufman could hope to gain in theoretical litigation against RUSH. TERBEEK also proposed that Kaufman could declare the principal of the loan as an investment loss for tax purposes, and then use the loss over several years to recoup 40% of the loan ($240,000).

43. Also during the January 28, 2014 conversation, TERBEEK stated that a "write off" of Kaufman's loan to RUSH would cause RUSH to resist endorsing other prospective applicants in Nevada who were seeking the UFCW endorsement. TERBEEK said, "The write off of [Kaufman's loan to RUSH] would go a long way towards doors slamming, slamming, slamming for other people."

44. During a monitored conversation on April 24, 2014, RUSH proposed that MediFarm sign a toothless neutrality agreement with the UFCW. A neutrality agreement obligates the signatory employer from actively resisting an organizing campaign of the signatory union of the employer's employees. RUSH produced a proposed neutrality agreement with Peterson and said "…that bullshit fucking neutrality agreement … I wrote it specifically so you could pull away from it." Then RUSH proceeded to advise Peterson how Peterson could secretly tell MediFarm's employees to not vote for UFCW affiliation.

45. On April 24, 2014 a person associated with the permit award process in Las Vegas, Nevada told me that TERBEEK was a California based attorney associated with RUSH. This witness explained that the witness directed TERBEEK and RUSH towards several clients who

14

were seeking medical marijuana licenses in Las Vegas, NV. This witness believed RUSH and TERBEEK were representing at least three medical marijuana groups in Nevada.

46. On April 30, 2014, TERBEEK met with Peterson in Las Vegas, Nevada, and provided Peterson a two-page memo intended to convince Kaufman that any adversarial proceeding regarding RUSH's eventual default would be risky for Kaufman. I have obtained a copy of the memo. The memo stated in part that the transaction between RUSH and Kaufman was "founded on a deal involving unclean hands to launder MMJ money." "MMJ" refers to "medical marijuana," which was the source of Kaufman's cash loaned to RUSH.

47. On May 14, 2014, TERBEEK met with Kaufman in TERBEEK's office at 2648 International Boulevard 102 and broke the news that RUSH could and would not repay Kaufman in January 2015. TERBEEK attempted to convince Kaufman that the bad debt could be partially repaid through a tax fraud scheme which TERBEEK would engineer. When Kaufman questioned how the scheme would work, TERBEEK explained that he had run the original $500,000 in cash through his attorney trust account and could back-date false documents showing a legitimate loan of the money with RUSH. I have reviewed a recording of this monitored conversation.

48. On May 23, 2014, TERBEEK met with Kaufman in TERBEEK's office at 2648 International Boulevard, Suite 102 and continued to push the tax scheme, adding that both TERBEEK and RUSH would lie if the scheme was ever questioned. TERBEEK then moved to the idea of "leveraging" RUSH's position with the UFCW to MediFarm's advantage. TERBEEK assured Kaufman that MediFarm would still satisfy the criterion of merit of union support in Nevada even though the prospective neutrality agreement between the UFCW and MediFarm had "no teeth." I have reviewed a recording of this monitored conversation.

49. On June 11, 2014, Kaufman met again with TERBEEK in TERBEEK's office at 2648 International Boulevard Suite 102, Kaufman presented TERBEEK with a version of the neutrality agreement which he had marked up further in MediFarm's favor. During this conversation, TERBEEK again attempted to persuade Kaufman to pursue the tax loss scheme saying he would "create the paperwork" that would reflect a tax loss. I have reviewed a recording of this monitored conversation.

50. On July 17, 2014, Kaufman met again with TERBEEK in TERBEEK's office at 2648 International Boulevard, Suite 102, to review the pro-employer changes in the standard UFCW neutrality agreement. TERBEEK stated, "I talked to [RUSH] about it. I specifically ran the language by [RUSH]." TERBEEK explained that TERBEEK and RUSH eviscerated the neutrality agreement's benefits to the UFCW by making key parts of the agreement contingent on MediFarm's unilateral consent. TERBEEK acknowledged all the intentional weaknesses in the agreement, described it as "toothless" and "illusory," and assured Kaufman that RUSH would sign it and then "bury" it. I have reviewed a recording of this monitored conversation.

51. On July 24, 2014, RUSH met with Peterson regarding the amended neutrality agreement at an Embassy Suites in Las Vegas. RUSH promised additional concessions to MediFarm including that RUSH would not keep a copy of the agreement in the UFCW records and that he would post-date the one-year agreement as of January 1, 2014, thereby further reducing its term. RUSH also advised Peterson how to effectively defeat a campaign by the UFCW to organize MediFarm's employees, including advising him how to commit unfair labor practices. RUSH acknowledged that the deal was "crooked" whereby he defanged the neutrality agreement while, at the same time, receiving loan forgiveness from Kaufman. I have reviewed a recording of this monitored conversation.

52. On August 6, 2014, RUSH sent an e-mail to TERBEEK, Peterson, and Kaufman with a generic endorsement letter from the UFCW to MediFarm attached to the email. RUSH instructed Peterson and Kaufman to fill out the missing information on the generic letter. The FBI has possession of the e-mail, the generic letter, and the signed and weakened neutrality agreement.

### E.   Summary of Probable Federal Criminal Violations

53. I believe there is probable cause that RUSH violated the Taft-Hartley Act, 29 U.S.C. § 186(b)(1); and that there is probable cause that TERBEEK conspired with RUSH and aided and abetted RUSH's criminal conduct. The evidence set forth above shows that RUSH, as an official of the UFCW, accepted money or things of value from an agent of employers that would employ individuals who would be admitted to membership in the UFCW, including: a) payments totaling $50,000 from Andersen; b) $51,000 of stock in AMCD, Inc. from Andersen; c) a loan of $500,000 in cash from Kaufman; d) a loan of $100,000 in cash from Kaufman; and e) $600,000 in loan forgiveness from Kaufman. TERBEEK conspired with and aided and abetted RUSH's conduct with regard to the loan payments from Kaufman and the effort to persuade Kaufman to forgive the loan in exchange for labor benefits.

54. There is probable cause to believe that RUSH and TERBEEK engaged in a scheme to defraud the UFCW and the Instituto, in violation of 18 U.S.C. §§ 1341, 1343, and 1346. The evidence set forth above indicates that RUSH, an official and fiduciary of the UFCW, and TERBEEK schemed to deprive the UFCW of RUSH's honest services by accepting several bribes and/or kickbacks in exchange for the UFCW's endorsement of prospective marijuana dispensary operators, for deliberately negotiating an ineffective neutrality agreement, and for

referring workers' compensation clients to TERBEEK in exchange for kickbacks from TERBEEK's law practice.

### REQUEST FOR SEALING

55.  Because this investigation is continuing, disclosure of the contents of this affidavit will jeopardize the progress of the investigation.  Accordingly, I request that the Court issue an order pursuant to which the Application for Search Warrant, the Search Warrant, and the Affidavit be filed under seal under further order of this Court.

### CONCLUSION

56. I request that the Court issue a warrant for the arrest of DAN RUSH for violations of 29 U.S.C. § 186 and 18 U.S.C. §§ 1341, 1343, and 1346.

ROAHN WYNAR
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed before me

this _10th_ day of August 2015

DONNA M. RYU
United States Magistrate Judge

18

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT
☐ SUPERSEDING

#### OFFENSE CHARGED

SEE ATTACHMENT.

☐ Petty
☐ Minor
☐ Misde-
   meanor
☒ Felony

PENALTY:   SEE ATTACHMENT

---

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

**FILED**
AUG 10 2015
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

#### DEFENDANT - U.S

▶ DANIEL RUSH

DISTRICT COURT NUMBER

4-15-71008

---

#### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI, SA Roahn Wynar

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:
☐ U.S. ATTORNEY   ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a
pending case involving this same
defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under
}

Name and Office of Person
Furnishing Information on this form   MELINDA HAAG

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)   JOHN HEMANN, AUSA

---

#### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior
summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer ☐ Yes   If "Yes"
been filed?  ☐ No    give date
                      filed

DATE OF
ARREST ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED
TO U.S. CUSTODY ▶   Month/Day/Year

☐ This report amends AO 257 previously submitted

---

#### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT      Bail Amount:

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or
warrant needed, since Magistrate has scheduled arraignment

Date/Time:                    Before Judge:

Comments:

## Penalty Sheet
## United States v. Dan Rush

Count One:  29 U.S.C. § 186

5 years imprisonment
3 years supervised release
$15,000 fine
$100 special assessment


Count Two:  18 U.S.C. §§ 1341, 1434, and 1346

20 years imprisonment
3 years supervised release
$250,000 fine (or twice gain or loss)
$100 special assessment